Rosemary M. Rivas (State Bar No. 209147)
Email: rrivas@zlk.com
**LEVI & KORSINSKY, LLP**
44 Montgomery Street, Suite 650
San Francisco, California 94104
Telephone: (415) 291-2420
Facsimile: (415) 484-1294

*Counsel for Plaintiff Merry Axelrod*

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MERRY AXELROD, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>KITE PHARMA, INC., ARIE BELLDEGRUN, DAVID BONDERMAN, FARAH CHAMPSI, IAN CLARK, ROY DOUMANI, FRANZ HUMER, JOSHUA A. KAZAM, RAN NUSSBAUM, JON PEACOCK, STEVEN B. RUCHEFSKY, OWEN N. WITTE, GILEAD SCIENCES, INC., and DODGE MERGER SUB, INC.,<br><br>Defendants. | Case No. 2:17-cv-6684<br><br>**CLASS ACTION**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 14(d)(4), 14(e), AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Merry Axelrod ("Plaintiff"), by her attorneys, alleges upon information and belief, except for her own acts, which are alleged on knowledge, as follows:

## INTRODUCTION

1.     Plaintiff brings this action on behalf of herself and the public stockholders of Kite Pharma, Inc. ("Kite" or the "Company") against Kite and members of its Board of Directors (collectively, the "Board" or the "Individual Defendants," as further defined below, and together with the Company "Defendants") for violations of Section 14(d)(4), 15 U.S.C. § 78n(d)(4), of the Securities and Exchange Act of 1934 (the "Exchange Act"), U.S. Securities and Exchange Commission (the "SEC") Rule 14d-9 promulgated

thereunder, 17 C.F.R. § 240, 14d-9, and 14(e) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78n(e), 78t(a).  Specifically, Defendants solicit the tendering of stockholder shares in connection with the sale of the Company to Gilead Sciences, Inc. ("Gilead" or "Parent"), through a recommendation statement that omits material facts necessary to make the statements therein not false or misleading.  Unless these disclosure deficiencies are cured, the Company's stockholders will be forced to decide whether to tender their shares based upon a materially incomplete and misleading Recommendation Statement (defined below).

2.     On August 28, 2017, Kite issued a press release announcing that they had entered into an Agreement and Plan of Merger dated August 27, 2017 (the "Merger Agreement"), by which Gilead's wholly-owned subsidiary, Dodgers Merger Sub, Inc. ("Purchaser"), would commence a tender offer (the "Tender Offer") to acquire all of the outstanding shares of Kite common stock for $180.00 per share in cash (the "Offer Consideration").  The Tender Offer, commenced September 5, 2017, is set to expire one minute after 11:59 p.m. Eastern Time, on October 2, 2017.  The proposed merger transaction between Kite and Gilead (the "Proposed Transaction") has a total value of approximately $11.9 billion.

3.     In connection with the commencement of the Tender Offer, on September 5, 2017, the Company filed a recommendation statement on a Schedule 14D-9 (the "Recommendation Statement") with the SEC.  The Recommendation Statement is materially incomplete and misleading because, *inter alia*, it fails to disclose material information about the facts and circumstances that led up to the Proposed Transaction. Without all material information, Kite stockholders cannot make a properly informed decision regarding whether to tender their shares.  The failure to adequately disclose such material information constitutes a violation of Sections 14(d)(4), 14(e), and 20(a) of the Exchange Act as stockholders need such information in order to make a fully-informed decision regarding whether to tender their shares in connection with the Proposed Transaction.

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 14(D)(4), 14(E), AND 20(A) OF THE SECURITIES EXCHANGE ACT OF 1934

4.    For these reasons, and as set forth in greater detail *infra*, the Individual Defendants have violated the federal securities laws and regulations promulgated thereunder.  Accordingly, Plaintiff seeks to enjoin the close of the Tender Offer or, in the event the Tender Offer closes without corrective disclosures being made, recover damages resulting from the Defendants' violations of these laws.  Judicial intervention is warranted here to rectify existing and future irreparable harm to the Company's stockholders.

## JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and Section 27 of the Exchange Act (15 U.S.C. § 78aa) because Plaintiff alleges violations of Sections 14(d), 14(e), and 20(a) of the Exchange Act and SEC Rule 14d-9.

6.    The Court has personal jurisdiction over each of the Defendants because each either conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (a) Kite maintains its headquarters in this District; (b) the conduct at issue took place and had an effect in this District; (c) a substantial portion of the corporate transactions and wrongs complained of herein occurred here; and (d) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect in this District.

## PARTIES

8.    Plaintiff is, and has been at all relevant times, the owner of shares of ordinary stock of Kite.

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 14(D)(4), 14(E), AND 20(A)
OF THE SECURITIES EXCHANGE ACT OF 1934

9.      Kite is a corporation organized and existing under the laws of the State of Delaware.  It maintains its principle executive offices at 2225 Colorado Avenue, Santa Monica, California 90404.  Kite's common stock trades on NASDAQ under the ticker symbol "KITE."

10.     Defendant Arie Belldegrun ("Belldegrun") is the founder of Kite, has served as Chairman of the Board since 2009, and has served as President and Chief Executive Officer ("CEO") of the Company since March 2014.

11.     Defendant David Bonderman ("Bonderman") has served as a director of the Company since February 2011.

12.     Defendant Farah Champsi ("Champsi") has served as a director of the Company since May 2013.

13.     Defendant Ian Clark ("Clark") has served as a director of the Company since January 2017.

14.     Defendant Roy Doumani ("Doumani") has served as a director of the Company since May 2011.

15.     Defendant Franz Humer ("Humer") has served as a director of the Company since September 2015.

16.     Defendant Joshua A. Kazam ("Kazam") has served as a director of the Company since June 2009.

17.     Defendant Ran Nussbaum ("Nussbaum") has served as a director of the Company since May 2013.

18.     Defendant Jon Peacock ("Peacock") has served as a director of the Company since March 2014.

19.     Defendant Steven B. Ruchefsky ("Ruchefsky") has served as a director of the Company since February 2011.

20.     Defendant Owen N. Witte ("Witte") has served as a director of the Company since March 2017.

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 14(D)(4), 14(E), AND 20(A)
OF THE SECURITIES EXCHANGE ACT OF 1934

21.    Defendants Belldegrun, Bonderman, Champsi, Clark, Doumani, Humer, Kazam, Nussbaum, Peacock, Ruchefsky, and Witte are collectively referred to as "Individual Defendants" and/or the "Board."

22.    Defendant Gilead, a necessary party named for relief purposes, is a company organized and existing under the laws of Delaware.

23.    Defendant Purchaser, a necessary party named for relief purposes, is a Delaware corporation and wholly-owned subsidiary of Gilead.

## CLASS ACTION ALLEGATIONS

24.    Plaintiff brings this action individually and as a class action on behalf of all holders of Kite common stock who are being, and will be, harmed by Defendants' actions described herein (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to, controlled by, or affiliated with, any Defendant, including the immediate family members of the Individual Defendants.

25.    This action is properly maintainable as a class action under the Federal Rule of Civil Procedure 23.

26.    The Class is so numerous that joinder of all members is impracticable. According to the Recommendation Statement, as of August 31, 2017, Kite had 57,410,242 shares of common stock outstanding.  While the exact number of Class members is presently unknown to Plaintiff and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in this Class.  All members of the Class may be identified from records maintained by Kite or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

27.    There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include, *inter alia*, the following: (i) whether Defendants recommended stockholders tender their shares pursuant to the Proposed Transaction through a

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 14(D)(4), 14(E), AND 20(A)
OF THE SECURITIES EXCHANGE ACT OF 1934

materially false or misleading Recommendation Statement in violation of federal securities laws; (ii) whether Plaintiff and other Class members will suffer irreparable harm if the securities laws violations are not remedied before the expiration of the Tender Offer; and (iii) whether the Class is entitled to injunctive relief as a result of Defendants' wrongful conduct.

28.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.  Plaintiff and the other members of the Class have sustained damages as a result of Defendants' wrongful conduct as alleged herein.

29.     Plaintiff will fairly and adequately protect the interests of the Class and has retained competent counsel experienced in litigation of this nature.

30.     The prosecution of separate actions by individual members of the Class creates a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for Defendants.

31.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

32.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

33.     Accordingly, Plaintiff seeks injunctive and other equitable relief on behalf of herself and the Class to prevent the irreparable injury that the Company's stockholders will continue to suffer absent judicial intervention.

## FURTHER SUBSTANTIVE ALLEGATIONS

### Company Background

34.     Kite is a leading developer of engineered cell therapies, which aim to fight cancer using a patient's own immune cells.  The Company's most advanced therapy candidate, axicabtagene ciloleucel (axi-cel), is currently under priority review by the

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 14(D)(4), 14(E), AND 20(A) OF THE SECURITIES EXCHANGE ACT OF 1934

U.S. Food and Drug Administration and the therapy candidate is expected to be the first to market as a treatment for refractory aggressive non-Hodgkin lymphoma.

***The Sale Process***

35.    In January 2017, Kite management met with more than 20 biotechnology and pharmaceutical companies while attending an industry conference to discuss the Company's business and potential opportunities for collaboration.  While attending this conference, Andrew Dickinson ("Dickinson"), Senior Vice President, Corporate Development of Gilead, met with Helen Kim ("Kim"), Kite's Executive Vice President ("EVP") of Business Development, for an informal discussion regarding the oncology field and Kite's general business.

36.    Shortly after this conference, Dickinson reached out to Kim and they decided to put in place a confidentiality agreement in order to facilitate further discussions and potential business transactions.  Kite and Gilead then entered into a confidentiality agreement, dated February 10, 2017.

37.    On March 14, 2017, the Board met and discussed potential financing or investments related to Kite's axi-cel product in the event it would be approved and also received presentations on internal financial forecasts from members of Company management.

38.    In March, April, and May of 2017, certain members of Company management met with Gilead to discuss updates on clinical studies of axi-cel and related topics.

39.    After three meetings between Kite management and Gilead management, in late May 2017, John F. Milligan ("Milligan"), President and CEO of Gilead, contacted Defendant Belldegrun, to discuss the meetings between the management teams and request a meeting between the two executives.

40.    On June 12, 2017, Defendant Belldegrun met with Milligan and Kevin Young ("Young"), Chief Operating Officer of Gilead, to discuss the prior meetings between the management teams.

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 14(D)(4), 14(E), AND 20(A)
OF THE SECURITIES EXCHANGE ACT OF 1934

41.     On June 30, 2017, Defendant Belldegrun and Company management met with Milligan and Alessandro Riva, Gilead's Senior Vice President, Oncology Therapeutics.

42.     On July 6, 2017, Defendant Belldegrun reached out to Centerview Partners LLC ("Centerview"), a financial advisor that Company management had frequent contact with, to discuss some of the interactions Kite had with Gilead.

43.     On July 7, 2017, Defendant Belldegrun spoke with Milligan about another potential in-person meeting.

44.     On July 10, 2017, Company management met with Centerview and began working on financial analyses relating to a potential transaction with Gilead.

45.     On July 13, 2017, Dr. David Chang ("Chang"), EVP, Research and Development and Chief Medical Officer of Kite, met with Milligan and representatives of Gilead to discuss the status of axi-cel and Kite's business.

46.     On July 16, 2017, Milligan and Young reached out to Defendant Belldegrun to inform him of Gilead's intention to submit an offer to acquire Kite for $127 per share in cash.  Later that day, Kite received a letter from Gilead confirming its interest in acquiring Kite for $127 per share (the "July 16 Proposal").

47.     On July 17, 2017, Defendant Belldegrun contacted Sullivan & Cromwell LLP ("Sullivan & Cromwell") and engaged it as counsel in connection with the contemplated transaction.

48.     Also on July 17, 2017, the Board met to discuss the July 16 Proposal and determined not to pursue a transaction and to instead focus on preparing axi-cel for approval and commercial launch.  The Board further determined that Gilead's offer was not attractive enough for them to change their view on the matter and instructed Defendant Belldegrun to inform Gilead as such.  During this meeting, Defendant Belldegrun informed the Board that Kite had begun working with Centerview related to a transaction with Gilead, subject to a determination by the Board to engage Centerview as its financial advisor.  During this meeting, the Board also determined to create the

Strategic Transaction Committee (the "Transaction Committee") to oversee responses to any further offers and submit recommendations to the Board on such. The Board appointed Defendant Humer, Defendant Bonderman, Defendant Clark, and Defendant Peacock as members of the Transaction Committee.

49.     On July 19, 2017, Defendant Belldegrun spoke with Milligan and informed him that Kite was not for sale and that the July 16 Proposal was not sufficient to continue discussions regarding a potential acquisition of Kite.

50.     On July 25, 2017, Milligan reached out to Defendant Belldegrun and they agreed to meet on July 28, 2017.

51.     On July 28, 2017, Defendant Belldegrun met with Milligan and John C. Martin ("Martin"), Gilead's Executive Chairman of the Board. During this meeting, Defendant Belldegrun discussed Kite's business and at the end of the meeting Milligan and Martin informed Defendant Belldegrun that Gilead would be willing to increase its offer to $160 per share in cash. Defendant Belldegrun again expressed disappointment with the offer price but agreed to facilitate a meeting between Company management and Gilead's management team to further demonstrate why Kite would not be willing to engage in a transaction at that price level.

52.     Later that same day, Kite received a letter from Gilead confirming the increased offer price of $160 per share (the "July 28 Proposal").

53.     On July 29, 2017, the Board met and Defendant Belldegrun provided an update on his discussions with Milligan and Martin and the July 28 Proposal. The Board discussed financial forecasts for the Company on a standalone basis (the "Standalone Forecasts") as well as adjusted forecasts (the "Adjusted Forecasts") which were developed to share with Gilead.

54.     On August 1, 2017, Defendant Belldegrun met with Milligan and other representatives of Gilead to discuss Kite's business model, axi-cel, and the next generation of products Kite had been working on. Following this meeting, Defendant Belldegrun and Milligan met separately to discuss the July 28 Proposal and Defendant

Belldegrun again expressed his disappointment with the level of the offer.  Milligan responded that it would be difficult for him to request an increase from Gilead's board of directors (the "Gilead Board").

55.     On August 2, 2017, Milligan emailed Defendant Belldegrun to thank him for the meeting.

56.     On August 3, 2017, the Transaction Committee met with Centerview and Sullivan & Cromwell to discuss the August 1st meeting and the Standalone Forecasts.

57.     On August 4, 2017, the Board met with Sullivan & Cromwell and Centerview and received an update on discussions with Gilead as well as the discussions which occurred during the Transaction Committee meeting.  The Board then further discussed the Standalone Forecasts.  Following this meeting, the Transaction Committee met and discussed how best to respond to Milligan's email, potentially spinning off a segment of the Company relating to research on T-cell receptors targeting neoantigens and selling the rest to Gilead, and the assumptions made in preparing the Standalone Forecasts.

58.     On August 7, 2017, Milligan reached out to Defendant Belldegrun and stated he would like to continue discussions.  Milligan indicated that Gilead might be able to increase its offer, but did not indicate by how much.  Defendant Belldegrun agreed to arrange a meeting between Gilead's management and Company management on August 11, 2017.

59.     On August 9, 2017, the Transaction Committee met with Sullivan & Cromwell and Centerview to conduct an in-depth review of the Standalone Forecasts and the latest discussions with Gilead.  The Transaction Committee then determined that if a compelling price could be reached, a sale of Kite might provide significant value to Kite's stockholders and eliminate risks associated with continuing Kite's current business plan, including as it relates to the approval and commercial launch of axi-cel. The Transaction Committee also discussed how Gilead was the most likely purchaser to be able to afford an acquisition of Kite given its cash on hand, significant interest in

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 14(D)(4), 14(E), AND 20(A) OF THE SECURITIES EXCHANGE ACT OF 1934

developing an oncology business, and its desire to complete the transaction prior to the commercial launch of axi-cel.  The Transaction Committee then determined that Defendant Belldegrun was in the best position to negotiate with Gilead.

60.     On August 11, 2017, Gilead management and Company management met to discuss Gilead's assumptions underlying its financial modeling for Kite.

61.     On August 12, 2017, the Board met with Sullivan & Cromwell and Centerview to discuss the status of negotiations with Gilead, and the Board authorized Defendant Belldegrun to continue discussions with Gilead so long as its next offer was sufficiently compelling.  The Board also discussed previous meetings that the Company had with other market participants and whether it might be useful to reach out to different biopharmaceutical companies to see if there were others interested in a potential acquisition of Kite.  However, the Board determined that doing so would unnecessarily distract Company management while they continued running Kite's business.  During this meeting, a member of the Transaction Committee also informed the Board that the Transaction Committee had engaged Centerview as its advisor and the Board authorized Defendant Belldegrun to execute and deliver an engagement letter with Centerview.

62.     On August 16, 2017, Defendant Belldegrun met with Milligan to discuss the next steps and they agreed that the next meeting should include Martin.

63.     On August 18, 2017, Defendant Belldegrun met with Milligan and Martin. Milligan and Martin informed Defendant Belldegrun that Gilead was prepared to raise its offer to $176 per share and that Gilead would be prepared to move quickly.  Defendant Belldegrun responded that he believed Kite's early stage pipeline had significant potential value and that Gilead should increase its offer to $180 per share.  Milligan indicated that he would be willing to recommend that offer price to the Gilead Board. Martin and Milligan then informed Defendant Belldegrun that they would submit a formal offer letter with the $180 per share price and a draft Merger Agreement that same evening.

64.     Later that evening, Kite received confirmation from Gilead in writing of the increased offer for $180 per share (the "August 18 Proposal") and a draft Merger Agreement was sent to Defendant Belldegrun.

65.     On August 19, 2017, the Transaction Committee met with Sullivan & Cromwell and Centerview to discuss the August 18 Proposal.  Defendant Belldegrun informed the Transaction Committee of his communications with Milligan and Martin and stated that Gilead was unwilling to discuss a potential spin-off of a separate entity that would focus on early-stage research of T cell receptors targeting neoantigens. During this meeting, the Transaction Committee also reviewed the terms of the draft Merger Agreement with Sullivan & Cromwell.

66.     On August 20, 2017, the Board met with Sullivan & Cromwell and Centerview and received an update on negotiations with Gilead.   The Board unanimously recommended that Company management continue and complete negotiations with Gilead.  Following this meeting, Defendant Belldegrun called Milligan to inform him that Kite was interested in continuing to provide disclosures to, and have additional discussions with, Gilead.

67.     Also on August 20, 2017, Kite provided Gilead with access to a data room for Gilead to perform its confirmatory due diligence investigation of the Company. Gilead continued to perform due diligence on Kite up until the execution of the Merger Agreement.

68.     On August 22, 2017, Sullivan & Cromwell delivered comments on the draft Merger Agreement to Gilead's outside counsel, Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden Arps") and the two firms discussed the terms of the transaction over the next several days.

69.     On August 24, 2017, Defendant Belldegrun and Milligan spoke and discussed strategies concerning the retention of Kite employees after the closing of the transaction.

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 14(D)(4), 14(E), AND 20(A) OF THE SECURITIES EXCHANGE ACT OF 1934

70. On August 26, 2017, the Transaction Committee met with Sullivan & Cromwell and Centerview to discuss the draft Merger Agreement. The final negotiations on the transaction were completed overnight on August 26, 2017.

71. On August 27, 2017, Defendant Belldegrun received a call from Milligan during which Milligan informed him that the Gilead Board approved entering into the Merger Agreement. Shortly thereafter, the Board met with Sullivan & Cromwell and Centerview and Centerview reviewed its financial analysis of the $180.00 per share offer price and rendered its oral opinion. Following additional consideration of the Merger Agreement the Board unanimously approved the Merger Agreement and resolved to recommend that Kite stockholders tender their shares in support of the Proposed Transaction.

72. Following the Board meeting, Kite, Gilead, and Purchaser executed the Merger Agreement.

73. Before the opening of the NASDAQ Stock Market on August 28, 2017, Kite and Gilead issues a joint press release announcing the execution of the Merger Agreement, which stated the following relevant information:

FOSTER CITY, Calif. & SANTA MONICA, Calif.--(BUSINESS WIRE)--Gilead Sciences, Inc. (Nasdaq: GILD) and Kite Pharma, Inc. (Nasdaq: KITE) announced today that the companies have entered into a definitive agreement pursuant to which Gilead will acquire Kite for $180.00 per share in cash. The transaction, which values Kite at approximately $11.9 billion, was unanimously approved by both the Gilead and Kite Boards of Directors and is anticipated to close in the fourth quarter of 2017. The transaction will provide opportunities for diversification of revenues, and is expected to be neutral to earnings by year three and accretive thereafter.

Kite is an industry leader in the emerging field of cell therapy, which uses a patient's own immune cells to fight cancer. The company has developed engineered cell therapies that express either a chimeric antigen receptor (CAR) or an engineered T cell receptor (TCR), depending on the type of cancer. Kite's most advanced therapy candidate, axicabtagene ciloleucel (axi-cel), is a CAR T therapy currently under priority review by the U.S. Food and Drug Administration (FDA). It is expected to be the first to market as a treatment for refractory aggressive non-Hodgkin lymphoma, which includes diffuse large B-cell lymphoma (DLBCL), transformed follicular lymphoma (TFL) and primary mediastinal B-cell lymphoma (PMBCL). The FDA has set a target action date of November 29, 2017 under the Prescription Drug User Fee Act (PDUFA). A

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 14(D)(4), 14(E), AND 20(A) OF THE SECURITIES EXCHANGE ACT OF 1934

marketing authorization application (MAA) has also been filed for axi-cel for the treatment of relapsed/refractory DLBCL, TFL and PMBCL with the European Medicines Agency (EMA), representing the first submission in Europe for a CAR T therapy. Approval in Europe is expected in 2018. Kite has additional candidates in clinical trials in both hematologic cancers and solid tumors, including KITE-585, a CAR T therapy candidate that targets BCMA expressed in multiple myeloma.

"The acquisition of Kite establishes Gilead as a leader in cellular therapy and provides a foundation from which to drive continued innovation for people with advanced cancers," said John F. Milligan, PhD, Gilead's President and Chief Executive Officer. "The field of cell therapy has advanced very quickly, to the point where the science and technology have opened a clear path toward a potential cure for patients. We are greatly impressed with the Kite team and what they have accomplished, and share their belief that cell therapy will be the cornerstone of treating cancer. Our similar cultures and histories of driving rapid innovation in order to bring more effective and safer products to as many patients as possible make this an excellent strategic fit."

Research and development as well as the commercialization operations for Kite will remain based in Santa Monica, California, with product manufacturing remaining in El Segundo, California.

"From the release of our pivotal data for axi-cel, to our potential approval by the FDA, this is a year of milestones. Each and every accomplishment is a reflection of the talent that is unique to Kite. We are excited that Gilead, one of the most innovative companies in the industry, recognized this value and shares our passion for developing cutting-edge and potentially curative therapies for patients," said Arie Belldegrun, MD, FACS, Chairman, President and Chief Executive Officer of Kite. "CAR T has the potential to become one of the most powerful anti-cancer agents for hematologic cancers. With Gilead's expertise and support, we hope to fulfill that potential by rapidly accelerating our robust pipeline and next-generation research and manufacturing technologies for the benefit of patients around the world."

***The Recommendation Statement Misleads Kite Stockholders by Omitting Material Information***

74.     On September 5, 2017, Kite filed a materially misleading Recommendation Statement with the SEC which was designed to convince stockholders to tender their shares to Gilead.   The Recommendation Statement is rendered misleading by the omission of critical information concerning potential conflicts of interest faced by Kite senior management when leading the search for strategic alternatives that ultimately resulted in the execution of the Merger Agreement, Centerview's financial analysis conducted in reaching its fairness opinion, and Kite's financial projections.  As such, the Recommendation Statement, which recommends that the Company's stockholders

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 14(D)(4), 14(E), AND 20(A)
OF THE SECURITIES EXCHANGE ACT OF 1934

tender their shares in support of the Proposed Transaction, misrepresents and/or omits material information in violation of Sections 14(d)(4), 14(e), and 20(a) of the Exchange Act.

***Potential Conflicts Facing Company Management and Directors***

75.    The Recommendation Statement contains material misrepresentations and omissions regarding employment negotiations taking place during the period in which the Proposed Transaction was being negotiated.

76.    The Recommendation Statement states that over several days in late August 2017, Sullivan & Cromwell, Skadden Arps, Gilead, and Kite negotiated various terms, including "provisions relating to employees" and that on August 24, 2017, Defendant Belldegrun spoke with Milligan and Gilead's Executive Vice President, Human Resources, Katie L. Watson about "strategies with respect to retention of employees." However, the Recommendation Statement fails to disclose the timing of any indications by Gilead that it intended to retain Kite management. More specifically, the Recommendation Statement fails to disclose when or how Gilead and Kite negotiated the decision to retain management such as: Chang; Timothy L. Moore, Executive Vice President, Technical Operations; Shawn Tomasello, Chief Commercial Officer; and Jeffrey Wiezorek, Senior Vice President, Clinical Development. Such absence is notably apparent because elsewhere the Recommendation Statement explicitly states that "Gilead has separately agreed to establish individual retention plans for each of Dr. Chang, Mr. Moore, Ms. Tomasello and Dr. Wiezorek." While the Recommendation Statement clarifies that the terms of these agreements have not yet been established, it fails to disclose how and when such agreements were reached in the first place.

77.    While formal agreements on the issue may not have been reached, it is clear that some communication on the issue took place and the Recommendation Statement fails to disclose such communications. Any communications—even one-sided written indications in proposals or other written communications—concerning post-merger employment between Gilead or its affiliates and any Kite officers, directors, or

employees, during the sales process, would be material to a stockholder's decision as to whether to tender their shares.  Such communications give rise to substantial undisclosed conflicts of interests.

78.    Thus, the Recommendation Statement materially misleads Kite stockholders by omitting material facts concerning the timing and nature of communications between Gilead and the Board or any Kite senior management regarding post-transaction retention of Kite's management and/or directors.    Kite stockholders are currently led to believe that the sales process was free from such conflicts of interest, and that no negotiations regarding management retention occurred. The omitted information relating to the timing, content, and parties involved in these communications concerning the post-transaction retention of Kite's management and/or directors would significantly alter the total mix of information that Defendants have disclosed to solicit stockholder support of the Proposed Transaction.  The conflicts of interests created and fostered by such communications would affect the stockholders' perception and analysis of the entire process and the ultimate fairness of the Proposed Transaction.  Thus the statements in the Recommendation Statement, relating to Kite's senior management and/or director's post-transaction retention, are rendered materially misleading by these omissions.

### Centerview's Financial Analysis

79.    The Recommendation Statement describes Centerview's fairness opinion and the various valuation analyses it performed in support of its opinion.  However, the description of Centerview's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses.  Without this information, as described below, Kite's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Centerview's fairness opinion in determining whether or not to tender their shares.  This omitted information, if disclosed, would significantly alter the total mix of information available to Kite's stockholders.

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 14(D)(4), 14(E), AND 20(A)
OF THE SECURITIES EXCHANGE ACT OF 1934

80.     With respect to Centerview's *Discounted Cash Flow Analysis*, the Recommendation Statement fails to disclose: (i) the items Centerview adjusted for in conducting its analysis, including: (a) capital expenditures, (b) depreciation and amortization, (c) changes in net working capital, (d) R&D and milestone expenses associated with early-stage platform programs, (e) platform value related to the Company's neoantigen platform and allogeneic platform, and (f) future net operating losses; (ii) the inputs and assumptions underlying the range of discount rates of 10.0% to 12.0%; and (iii) Centerview's basis for assuming that after December 31, 2032, unlevered free cash flows would decline in perpetuity at a rate of free cash flow decline of 50.0% year-over-year.

81.     With respect to Centerview's *Selected Public Company Analysis*, the Recommendation Statement omits the individual multiples and financial metrics for the companies observed by Centerview in its analysis.

82.     With respect to Centerview's *Selected Precedent Transactions Analysis*, the Recommendation Statement omits the individual multiples for each of the comparable transactions.  The disclosure of such multiples is necessary because they are a crucial element of these analyses, as the analysis is based on comparison and relative value.  Without such disclosure, stockholders are unable to determine whether the range of multiples selected by Centerview reflects appropriately comparable transactions to the Proposed Transaction.

83.     Failure to disclose the foregoing information renders the statements in the Recommendation Statement made by Centerview pertaining to the fairness of the Proposed Transaction misleading.   Without such information, the Company's stockholders are being misled as to the reliability of and basis for Centerview's fairness opinion.

Case No. 2:17-cv-6684

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 14(D)(4), 14(E), AND 20(A) OF THE SECURITIES EXCHANGE ACT OF 1934

*Misleading Statements and Omissions Regarding the Company's Financial Projections*

84.     The Recommendation Statement fails to disclose material information concerning the Company's financial projections which were utilized by Centerview in performing the analyses underpinning its fairness opinion.

85.     With respect to the *Adjusted Forecasts*, the Recommendation Statement states that the "Adjusted Forecasts include long-term projections of total net product revenue in the United States and European Union," however the Recommendation Statement discloses only one category of projections, "Total U.S. and E.U. net product revenue."  Given that Gilead based much of its initial pursuit of Kite on the Adjusted Forecasts, any additional projected metrics, if calculated, are material to stockholders.  Alternatively, if this were the only metric calculated for the Adjusted Forecasts, the Recommendation Statement should clarify its description of the Adjusted Forecasts.

86.     With respect to the *Standalone Forecasts*, the Recommendation Statement discloses a non-GAAP accounting metrics for projected financial information over the years 2017E to 2032E: Total EBIT.  However, providing this non-GAAP metric without disclosing all line item metrics used to calculate it, or otherwise reconciling the non-GAAP projection to the most comparable GAAP equivalent, makes the provided disclosures materially incomplete and misleading.

87.     Additionally, the Recommendation Statement discloses the value of the Company's unlevered free cash flows ("UFCF") and defines the non-GAAP metric as earnings before interest, taxes, depreciation and amortization, less capital expenditures, less changes in net working capital and less tax expense, but fails to provide the value of the underlying line items: (i) capital expenditures; (ii) changes in net working capital; (iii) depreciation and amortization; (iv) taxes; (v) tax expense; (vi) earnings; and (vii) interest.  The Recommendation Statement also fails to reconcile UFCF to its most comparable GAAP equivalent.

88.     Non-GAAP measures have no universally understood definition and vary widely between companies depending on the needs of management in promoting their own effect on Company performance.  Without these measures, cherry-picking the disclosed projections materially misleads Kite stockholders and renders Centerview's financial analysis materially incomplete and misleading.

89.     Because of the non-standardized and potentially manipulative nature of non-GAAP measures, when a company discloses information in a recommendation statement that includes non-GAAP financial measures, the Company must also disclose comparable GAAP measures and a quantitative reconciliation of forward-looking information pursuant to Regulation G.  17 C.F.R. § 244.100.

90.     Indeed, the SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such projections.[1]  In fact, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial metrics that demonstrate the SEC is indeed tightening policy.[2]  One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide *any* reconciling metrics that are available without unreasonable efforts.

91.     Thus, the above-referenced line-item projections that have been omitted from the Recommendation Statement are precisely the types of "reconciling metrics" that the SEC has recently indicated should be disclosed to render non-GAAP financial projections not misleading to shareholders.

---

[1]     *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[2]     *Non-GAAP Financial Measures, Compliance & Disclosure Interpretations*, SEC (May 17, 2016), https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 14(D)(4), 14(E), AND 20(A)
OF THE SECURITIES EXCHANGE ACT OF 1934

92.     Defendants' failure to provide Kite's stockholders with the foregoing material information renders the financial projections and analyses depicted in the Recommendation Statement materially incomplete and misleading, and constitutes a violation of Sections 14(d), 14(e), and 20(a) of the Exchange Act, and Rule 14d-9 promulgated thereunder.

93.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company stockholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

## COUNT I

### Claims Against All Defendants for
### Violations of Section 14(e) of the Exchange Act

94.     Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

95.     Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . ." 15 U.S.C. § 78n(e).

96.     As discussed above, Kite filed and delivered the Recommendation Statement to its stockholders, which Defendants knew or recklessly disregarded contained material omissions and misstatements as set forth above.

97.     Defendants violated Section 14(e) of the Exchange Act by issuing the Recommendation Statement in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in connection with the Tender Offer commenced in conjunction with the Proposed Transaction. Defendants knew or recklessly disregarded that the Recommendation Statement failed to disclose

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 14(D)(4), 14(E), AND 20(A)
OF THE SECURITIES EXCHANGE ACT OF 1934

material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

98. The Recommendation Statement was prepared, reviewed, and/or disseminated by Defendants. It misrepresented and/or omitted material facts, including material information about the intrinsic value of the Company and potential conflicts of interest faced by certain Individual Defendants.

99. Defendants have caused the Recommendation Statement to be issued with the intention of soliciting stockholder support of the Proposed Transaction.

100. In so doing, Defendants made untrue statements of material facts and omitted material facts necessary to make the statements that were made not misleading in violation of Section 14(e) of the Exchange Act. By virtue of their positions within the Company and/or roles in the process and in the preparation of the Recommendation Statement, Defendants were aware of this information and their obligation to disclose this information in the Recommendation Statement.

101. The omissions and incomplete and misleading statements in the Recommendation Statement are material in that a reasonable stockholder would consider them important in deciding whether to tender their shares. In addition, a reasonable investor would view the information identified above which has been omitted from the Recommendation Statement as altering the "total mix" of information made available to stockholders.

102. Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with supporting the Proposed Transaction, they caused it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and misleading.

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 14(D)(4), 14(E), AND 20(A) OF THE SECURITIES EXCHANGE ACT OF 1934

103.   The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff and the Class will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the Tender Offer.

## COUNT II

**Claims Against All Defendants for Violations of Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 (17 C.F.R. § 240.14d-9)**

104.   Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

105.   Defendants have caused the Recommendation Statement to be issued with the intention of soliciting stockholder support of the Proposed Transaction.

106.   Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers.

107.   The Recommendation Statement violates Section 14(d)(4) and Rule 14d-9 because it omits material facts, including those set forth above, which renders the Recommendation Statement false and/or misleading.

108.   Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading.  Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and misleading.

109.   The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff and the Class will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the tender offer.

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 14(D)(4), 14(E), AND 20(A) OF THE SECURITIES EXCHANGE ACT OF 1934

## COUNT III

### Claim for Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

110.    Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

111.    The Individual Defendants acted as controlling persons of Kite within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Kite and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Recommendation Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

112.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Recommendation Statement alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

113.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.  The Recommendation Statement contains the unanimous recommendation of the Individual Defendants to support the Proposed Transaction.   They were thus directly involved in the making of the Recommendation Statement.

114.    By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the Exchange Act.

115.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(d)

of the Exchange Act and Rule 14d-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' conduct, Plaintiff and the Class are threatened with irreparable harm.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Declaring that this action is properly maintainable as a class action and certifying Plaintiff as the Class representative and her counsel as Class counsel;

B.      Declaring that the Recommendation Statement is materially false or misleading;

C.      Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

C.      In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding Plaintiff and the Class rescissory damages;

D.      Directing the Individual Defendants to disseminate a Recommendation Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

E.      Declaring that Defendants violated Sections 14(d)(4), 14(e), and/or 20(a) of the Exchange Act, as well as Rule 14d-9 promulgated thereunder;

F.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

G.      Granting such other and further relief as this Court may deem just and proper.

1

## **JURY DEMAND**

2

Plaintiff respectfully requests a trial by jury on all issues so triable.

3

4

Dated: September 11, 2017                    **LEVI & KORSINSKY, LLP**

5

By:  _/s/Rosemary M. Rivas_

6

Rosemary M. Rivas
44 Montgomery Street, Suite 650

7

San Francisco, CA 94104
Telephone: (415) 291-2420

8

Facsimile: (415) 484-1294

9

*Counsel for Plaintiff Merry Axelrod*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 2:17-cv-6684

CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 14(D)(4), 14(E), AND 20(A) OF THE SECURITIES EXCHANGE ACT OF 1934



LEVI&KORSINSKY LLP

30 Broad Street, 24th Floor
New York, NY 10004
T:212-363-7500
F:212-363-7171
www.zlk.com

**CERTIFICATION OF PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS**

I, Merry Axelrod , declare as to the claims asserted under the federal securities laws, as follows:

1. I have reviewed the Complaint and authorized its filing.

2. I did not purchase the securities that are the subject of this Complaint at the direction of Plaintiffs' counsel or in order to participate in this litigation.

3. I am willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. I currently hold shares of Kite Pharma, Inc. My purchase history is as follows:

| Purchase Date | Stock Symbol | Shares Transacted | Price Per Share |
|---|---|---|---|
| 4/8/17 | KITE | 3 | 82.38 |
| 5/4/17 | KITE | 12 | 83.978 |

5. During the three years prior to the date of this Certification, I have not participated nor have I sought to participate, as a representative in any class action suit in the United States District Courts under the federal securities laws.

6. I have not received, been promised or offered, and will not accept, any form of compensation, directly or indirectly, for prosecuting or serving as a representative party in this class action, except for: (i) such damages or other relief as the Court may award to me as my pro rata share of any recovery or judgment; (ii) such reasonable fees, costs or other payments as the Court expressly approves to be paid to or on behalf of me; or (iii) reimbursement, paid by my attorneys, of actual or reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

I declare, under penalty of perjury, that the foregoing is true and correct. Executed this September 8, 2017, at LAKE FOREST, CA.

Name: Merry Axelrod

Signed:

IP: 72.52.130.243